IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| KEVIN SCOTT VARGA, | § | |
| PETITIONER, | § | |
| vs. | § | No. 3:05-CV-0376-K |
| | § | |
| NATHANIEL QUARTERMAN, | § | |
| DIRECTOR, TEXAS DEPARTMENT OF | § | |
| CRIMINAL JUSTICE, | § | |
| CORRECTIONAL INSTITUTIONS | § | |
| DIVISION, | § | |
| RESPONDENT. | § | |

**MEMORANDUM OPINION AND ORDER
DENYING PETITION FOR WRIT OF HABEAS CORPUS**

Petitioner Kevin Scott Varga, sentenced to death for capital murder, petitions the Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, contending that his conviction and sentence are unconstitutional in several respects. The Court denies petitioner's petition for a writ of habeas corpus.

**I. HISTORY OF THE CASE**

A jury convicted petitioner of capital murder, and his punishment was assessed at death by lethal injection. *State v. Varga*, No. 20,042 (354th Judicial District Court, Hunt County, Texas, Nov. 20, 2000). The Texas Court of Criminal Appeals affirmed both the conviction and the death sentence in an unpublished opinion. *Varga v. State*, No. 73,990 (Tex. Crim. App. June 25, 2003). Petitioner filed a state application for writ of habeas corpus on March 18, 2003. The Court of Criminal Appeals denied relief in an unpublished order. *Ex parte Varga*, No. 59,471-01 (Tex. Crim. App. Sept. 15, 2004).

Petitioner filed the instant federal writ of habeas corpus on September 15, 2005, challenging his conviction and death sentence. Respondent filed an answer on January 24, 2006, and furnished the state court records. Petitioner filed a reply brief on March 26, 2006.

## II. ISSUES

Petitioner asserts that he is being held unlawfully by respondent on the following five grounds for relief :

A.  Petitioner was denied his rights under the Sixth and Fourteenth Amendments because a qualified veniremember was excluded from service on the grounds that she was opposed to the death penalty, and petitioner was denied his right to effective assistance of counsel on appeal because appellate counsel failed to raise this as an issue on appeal (grounds two and three);

B.  Petitioner was denied his Sixth Amendment right to effective assistance of counsel on appeal because appellate counsel failed to raise as an issue on appeal the admission of expert fingerprint testimony at trial (ground one);

C.  Petitioner was denied his due process rights under the Fourteenth Amendment because impermissible victim impact testimony was admitted into evidence at the punishment phase of the trial (ground five); and

D.  Petitioner was denied his Sixth Amendment right to an impartial jury because the jury was not required to find the absence of mitigating circumstances warranting a life sentence beyond a reasonable doubt (ground four).

## III. STANDARD OF REVIEW

Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. 104-132, 110 Stat. 1217, on April 24, 1996. Title I of the Act applies to all federal petitions for habeas corpus filed on or after its effective date. *Lindh v. Murphy*, 521 U.S. 320, 326 (1997). Because petitioner filed the instant petition after its effective date, the Act applies to his petition.

Title I of the AEDPA substantially changed the way federal courts handle habeas corpus actions. Under 28 U.S.C. § 2254(d), as amended by the AEDPA, a state prisoner may not obtain relief

with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

"In the context of federal habeas proceedings, a resolution (or adjudication) on the merits is a term of art that refers to whether a court's disposition of the case was substantive, as opposed to procedural." *Miller v. Johnson*, 200 F.3d 274, 281 (5th Cir. 2000). In this case, the denial of petitioner's state writ constitutes an adjudication on the merits. *See Ex parte Thomas*, 953 S.W.2d 286, 288-89 (Tex. Crim. App. 1997) (holding that a denial, rather than a dismissal, signifies an adjudication on the merits). The court of appeals also considered the merits of petitioner's claims raised on direct appeal. *See Sims II*. The AEDPA standards enumerated in 28 U.S.C. § 2254(d) thus apply.

Section 2254(d)(1) concerns pure questions of law and mixed questions of law and fact. *Martin v. Cain*, 246 F.3d 471, 475 (5th Cir. 2001). A decision is contrary to clearly established Federal law, within the meaning of § 2254(d)(1), "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).

With respect to the "unreasonable application" standard, *Williams* instructs that a writ must issue "if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413; *accord Penry v. Johnson*, 532 U.S. 782, 792 (2001). Likewise under *Williams*, a state court unreasonably applies

3

Supreme Court precedent if it "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." 529 U.S. at 407. "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409; *accord Penry*, 532 U.S. at 793.

Section 2254(d)(2) concerns questions of fact. *Moore v. Johnson*, 225 F.3d 495, 501 (5th Cir. 2000). Under § 2254(d)(2), federal courts "give deference to the state court's findings unless they were 'based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.'" *Chambers v. Johnson*, 218 F.3d 360, 363 (5th Cir. 2000). The resolution of factual issues by the state court is presumptively correct and will not be disturbed unless the state prisoner rebuts the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

## IV. FACTUAL BACKGROUND

The Court of Criminal Appeals recited the following factual background in its opinion on direct appeal:

> On September 1, 1998, the appellant, Venus Anderson, Billy Galloway, and Deannee Ann Bayless, left Sioux Falls, South Dakota in Galloway's Bronco, intending to travel to Mexico. On their way south, the appellant asked Anderson if she knew what it meant to "roll" someone. He explained that it meant she would go to a bar, meet a man and take him back to their hotel room, where the appellant would be hiding. When she had the man with his pants down, the appellant would come out and blackmail the man for his money. Anderson agreed to the plan, and the appellant instructed her to choose someone who was older, somewhat weak, and not too heavy. Bayless was going to pretend to be Anderson's sister. In Wichita, Kansas, they decided to carry out the plan. Before leaving their hotel room for a bar, Anderson saw the appellant swing a metal pole around the room and complain that it was too long.
>
> The four went to a bar where Bayless and Anderson met David McCoy. The girls picked up Galloway and McCoy, and the four rode in McCoy's car to the hotel room, where the appellant was hiding in the bathroom with a metal pole. The appellant left

4

the bathroom and entered the room with the pole. Anderson left the room but testified to hearing thuds. Anderson stepped around the corner with Galloway, and Galloway yelled out "that's enough." McCoy was lying on the floor. Anderson testified that the appellant, Galloway, and Bayless began "jumping around and hugging each other and kissing each other and coming up to me and hugging me and asking me if I was all right and telling me it was all right...[t]he first murder was always that way, you know...And they kept hugging and kissing me." When Bayless discovered just eighty dollars in McCoy's wallet, Galloway started kicking and spitting on McCoy's body and calling him names. Before leaving the room, they cut out the portion of the carpet soaked with blood and attempted to wipe blood from the walls. They wrapped McCoy's body in blankets and loaded it into the Bronco. They left the Bronco in a parking lot when it broke down a few blocks from the hotel.

McCoy's body was found several days later in a state of advanced decomposition. The medical examiner testified that the skull fractures in the back of McCoy's head were severe: "the bone was broken into so many small pieces they simply fell to the autopsy table." In addition, there was a skull fracture on the floor of the skull of a type that most commonly occurs in car accidents. Both cheekbones, the jaw area, and the left eye socket were fractured. There were numerous lacerations about the head, including some that split the left ear in half. The cause of death was determined to be blunt force trauma to the head.

Meanwhile, after leaving the Bronco, the four continued south in McCoy's car. In Texas, they began to discuss "rolling" someone again. They went to a Holiday Inn in Greenville, where Anderson and Bayless went into the lounge and met David Logie. They eventually left with him in his car, with Bayless driving. Galloway and the appellant followed in McCoy's car. Bayless drove to a deserted area of town behind a building. Bayless and Logie got out of the car to have sex on the hood. A few minutes later, Anderson heard Galloway's voice and saw him punching Logie. Logie was screaming, "Please don't kill me, please. You can have my money...my car, anything, but please, please don't kill me," but Galloway kept hitting him. After several minutes, the appellant appeared from behind the car and handed Galloway an object. Logie was still lying on the ground screaming. Galloway began striking Logie with the object for several more minutes. A police officer testified that a ball-peen hammer and pieces of a bloody tree limb were found near Logie's body. After taking Logie's wallet, the four dragged his body into the woods and set it on fire. The medical examiner testified that there were extensive injuries to the head region. There were multiple fractures of the bones above the left eyebrow, fractures in the orbital ridge, the cheeks, the nose, the upper and lower jaws, mandible, teeth, and also other multiple lacerations about the head and upper body, which were consistent with having been struck with a hammer and/or a tree limb. A severely depressed skull fracture at the base of the skull caused a depression into the cranial vault. The body showed abrasions consistent with being dragged. The cause of death was determined to be blunt force injuries to the head.

5

> The foursome continued south in Logie's car, arriving in San Antonio where Anderson and Bayless went shopping at the mall with Logie's credit cards while the appellant and Galloway went to a strip club. When Anderson and Bayless left the mall, they were pulled over by police. Anderson confessed to the two murders and surrounding events when placed in the patrol car. The appellant and Galloway were arrested at the strip club.

*Varga*, slip op. at 2-6.

## V. EXAMINATION OF THE GROUNDS FOR RELIEF

### A. Challenge for Cause Claims

In his second ground for relief, petitioner contends that his rights under the Sixth and Fourteenth Amendments were violated because a qualified veniremember was excluded from service. In his third ground for relief, petitioner argues that he received ineffective assistance of counsel on appeal because his appellate counsel did not raise this claim on appeal. In response, respondent contends that the veniremember was properly excused because she vacillated when asked whether her opposition to the death penalty would prevent her from being able to follow her oath as a juror. Accordingly, respondent argues that petitioner's constitutional rights were not violated by her excusal from jury service and appellate counsel was not ineffective for failing to raise a meritless claim on appeal.

*Applicable Law*

The Supreme Court has held that the Sixth and Fourteenth Amendments prohibit a potential juror from being excused for cause from a capital murder case because he is opposed to the death penalty unless his views on the death penalty would prevent or substantially impair his ability to perform his duties as a juror with respect to the instructions and his oath. *Wainwright v. Witt*, 469 U.S. 412, 424 (1985). A prospective juror who can set aside her beliefs against capital punishment and follow the law is not challengeable for cause. *Witherspoon v. Illinois*, 391 U.S. 510, 522, 88 S.Ct. 1770, 1776,

6

20 L.Ed.2d 776 (1968). The Supreme Court has further held that the excusal for cause of a juror in violation of *Witherspoon* is reversible constitutional error which is not subject to a harmless error review. *Gray v. Mississippi*, 481 U.S. 648, 668 (1987).

The Sixth Amendment to the United States Constitution guarantees a criminal defendant the effective assistance of counsel, both at trial and on appeal. *Strickland v. Washington*, 466 U.S. 668 (1984); *Evitts v. Lucey*, 469 U.S. 387, 396 (1985). To successfully state a claim of ineffective assistance of counsel under Supreme Court precedent, petitioner must demonstrate (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced his defense. *See Strickland v. Washington*, 466 U.S. at 687. A failure to establish either prong of this test requires a finding that counsel's performance was constitutionally effective. *Id.* at 696. To determine whether counsel's performance is constitutionally deficient, courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable assistance." *Strickland*, 466 U.S. at 689. To establish prejudice, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

*Analysis*

During jury voir dire, the State challenged Veniremember Harvetta Robertson for cause on the basis that her personal views and objections to the death penalty would substantially impair the performance of her duties as a juror. (R. 22:147). The trial court granted this challenge over defense counsel's objection. (R. 22:147, 153). The court's decision to grant this challenge for cause was not raised as an issue on direct appeal. At the state habeas level, petitioner contended that his rights under the Sixth and Fourteenth Amendments were violated because a qualified veniremember was excluded

7

from jury service because she was opposed to or had conscientious scruples against the death penalty and because his appellate counsel did not raise this issue as a claim on direct appeal. (State Habeas Transcript, volume I, p. 17).

In his findings and conclusions, the state habeas court found that Veniremember Robertson consistently stated that her religious and moral beliefs would affect her view of the evidence and her answers to the punishment special issues and that her moral opposition to the death penalty would make it emotionally difficult for her to serve on the jury. The court further found that, although Robertson indicated that she would follow the court's instructions in accordance with her oath and the law, her bias against the death penalty would substantially impair her ability to carry out the oath and jury instructions. (SHTr. II:170). The court based these finding on instances in the record where: 1) she stated that she would have a difficult time listening to all of the evidence, following the law, and voting for the death penalty even where the evidence warranted it (R. 22:119-20, 144); 2) she stated that she could follow her oath as a juror but could not state that she would not be thinking about her personal beliefs, and she stated that she did not know how to set aside her personal beliefs in order to follow the law (R. 22:134, 138); 3) she stated that her personal beliefs against the death penalty might influence the way that she would hear the evidence and could influence her ultimate decision (R. 22:139, 141); and 4) after being asked by the trial judge if she could set aside her strong feelings against the death penalty and answer questions according to the evidence, she answered that she could not state that she would be able to put her feelings aside. (R. 22:146).

The state habeas court then concluded that Petitioner had failed to establish that Robertson was excluded from jury service on the ground that she had conscientious objections to the death penalty. The state habeas court further concluded that Petitioner had failed to prove ineffective assistance of

counsel because the trial court did not err in excusing Robertson from jury service because she admitted that her views on the death penalty would either prevent or substantially impair her ability to follow the law and because she vacillated between her strong religious beliefs and her desire to follow the law. (SHTr. II:176). The Court of Criminal Appeals adopted the state habeas court's conclusions and denied relief. *See Ex parte Varga*, No. 59,471-01, slip op. at 2.

The state court's conclusions are not unreasonable applications of either the *Witt/Witherspoon* standard or the *Strickland* standard. The record from the trial reflects that, while Venireperson Robertson did state that she could follow the law and could follow her oath as a juror (R. 22:125, 134, 140), she also stated that she could never give someone the death penalty. (R. 22:137). And, she stated that she did not know how to set aside her personal beliefs in order to follow the law and that her personal beliefs against the death penalty might influence the way that she would hear the evidence and could influence her ultimate decision. Finally, she was unable to assure the trial judge that she would be able to put her feelings aside and answer questions the jury would be required to answer according to the evidence. Thus, the record before this Court supports the state habeas court's conclusion that Ms. Robertson's views against capital punishment would either prevent or substantially impair her ability to perform her duties as a juror with respect to the instructions and her oath. Accordingly, petitioner's constitutional rights were not violated when the trial court granted the State's challenge for cause against Ms. Robertson.

Therefore, appellate counsel was not ineffective for failing to raise this as an issue on appeal. Recently, in *Russeau v. State*, 171 S.W.3d 871, 879-80 (Tex. Crim. App. 2005), *cert. denied*, 126 S.Ct. 2982 (2006), the Court of Criminal Appeals held that a prospective juror who vacillated about her position on the death penalty and gave conflicting answers about her ability to follow the law could

9

be struck for cause under the *Witherspoon/Witt* standard. Petitioner has failed to establish that, had such a claim been raised on appeal in his case, it would have been decided any differently by the Court of Criminal Appeals. Petitioner has therefore failed to prove any deficiency in appellate counsel's representation in this regard. Petitioner's second and third grounds for relief are without merit and are denied.

**B.     Fingerprint Testimony Claim**

In his first ground for relief, petitioner claims that his right under the Sixth Amendment to effective assistance of counsel on appeal was violated. Specifically, petitioner argues that his appellate counsel was ineffective because he failed to argue on appeal that the trial court erred in admitting expert testimony regarding fingerprint testimony. Petitioner contends that fingerprint testimony was inadmissible at his trial because the State did not establish the reliability of fingerprint evidence.

*Applicable Facts*

In the case at hand, Vernon Ginn, a fingerprint examiner with the San Antonio Police Department, and Jim McNutt, fingerprint examiner for the Sedgewick County, Kansas sheriff's department, testified for the State as fingerprint experts. Mr. Ginn testified that Venus Anderson's palm print was retrieved from hood of David Logie's rental car, recovered after Venus and Deannee were arrested in San Antonio. (R. 54:71-8). Mr. McNutt testified that petitioner's palm prints were retrieved from the tailgate of Billy Galloway's Ford Bronco after it was discovered in Wichita, Kansas, with David McCoy's body in the back of the truck. (R. 57:46-8).

Prior to Mr. Ginn's testimony before the jury, the trial court held a hearing on its admissibility. At this hearing, Mr. Ginn testified that he has been making fingerprint comparisons for twenty-eight years, has made comparisons hundreds, if not thousands of times, and has testified in state and federal

courts hundreds of times (R. 54:49-50). Ginn further testified that he has graduated from several fingerprint schools held by the Texas Department of Public Safety, has graduated from the advanced FBI latent fingerprint school, is a member of the International Association for Identification, and is an instructor at the local academy on fingerprints. (R. 54:52-3). Defense counsel then questioned Ginn about the underlying principal of the science of fingerprints that no two individuals have the same fingerprint. In response, Ginn testified that he had not read any recent studies proving this principal, but he had read the history of fingerprinting where studies on this issue that were conducted in the early twentieth century during the development of the field were mentioned. (R. 54:56-8). Defense counsel objected to the admission of Ginn's fingerprint testimony on the basis that it was a theory that had not been sufficiently tested to validate it as a science, because Ginn could point to no recent studies and did not recall the details of older studies proving that fingerprints are unique to each person. (R. 54:59). At the conclusion of the hearing, the trial court found by clear and convincing evidence that the theory behind fingerprints is a valid theory, that Ginn had the requisite expertise in the field, that fingerprint testimony is relevant and reliable and would be an aid to the jury, and the court therefore accepted Ginn as an expert witness. (R. 54:63-4). No hearing was held before Mr. McNutt testified.

*Applicable Law*

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court established a two-prong test to determine whether expert testimony merits admission into evidence at trial under Rule 702 of the Federal Rules of Evidence. The testimony must: 1) be based on scientific knowledge, and 2) assist the trier of fact in understanding or determining a fact in issue. *Id.* at 592. In *Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992), the Court of Criminal Appeals outlined

several factors in determining the admissibility of expert testimony under its analogous Rule 702, including: 1) the extent to which the underlying theory and technique are accepted as valid by the scientific community; 2) the qualifications of the testifying expert; 3) the existence of literature either supporting or rejecting the theory and technique; 4) the potential rate of error of the technique; 5) the availability of other experts to test and evaluate the technique; 6) the clarity with which it can be explained to the court; and 7) the experience and skill of the person who applied the technique in the applicable case.

*Analysis*

At the state level, the state habeas court in addressing this issue, found that courts have recognized fingerprint identification as reliable for many years. The state habeas court therefore found that any claim made on this basis on appeal would have been a frivolous one and concluded that appellate counsel was not ineffective for failing to raise this as an issue on appeal. (SHTr. II:167, 174). The Court of Criminal Appeals adopted the trial court's conclusion and denied relief. *See Ex parte Varga*, No. 59,471-01, slip op. at 2.

This decision is not an unreasonable application of the *Strickland* standard. As the state habeas court noted in its findings and conclusions, the Court of Criminal Appeals has sanctioned the testimony of fingerprint experts since 1941. *See Grice v. State*, 151 S.W.2d 211, 221 (1941). And, as noted by respondent, the Court of Criminal Appeals recently rejected a similar challenge to the admissibility of fingerprint testimony. *See Russeau v. State*, 171 S.W.3d 871, 882-83 (Tex. Crim. App. 2005). Hence, a decision not to appeal the trial court's determination on the reliability of such testimony was not ineffective assistance of counsel. *See Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990) (noting that the Fifth Circuit has consistently held that counsel is not ineffective for failing to make futile

motions or objections). Nor has Petitioner established any prejudice from the failure to raise this issue on appeal as Petitioner has failed to show that, had such an issue been raised, the Court of Criminal Appeals would have found in Petitioner's favor. Fingerprint testimony has been presented in cases for many years, and has thus been accepted as valid scientific evidence. *See United States v. Havvard*, 260 F.3d 597 (7th Cir. 2001). Given the experience of the fingerprint experts who testified at trial and the prevalence of fingerprint testing in courtrooms throughout this country, the relevant federal and state precedents demonstrate that the testimony was reliable expert testimony. This claim is without merit, and it is denied.

**C.     Victim Impact Testimony Claim**

In his fifth ground for relief, petitioner claims that he was denied his due process rights under the Fourteenth Amendment because the wife of one of the murder victims gave impermissible victim impact testimony at the punishment phase of the trial. In particular, petitioner asserts that the admission of this evidence over defense objection was so unduly prejudicial that it rendered his trial fundamentally unfair.

During rebuttal at the punishment phase of the trial, the State called Diane Logie, the wife of one of the victims, as a witness. Prior to her testimony, and outside of the presence of the jury, defense counsel objected to her testimony as being improper rebuttal testimony. In particular, defense counsel argued that, while her victim impact testimony would not have been objectionable in the State's case-in-chief at the punishment phase of the trial, because the defense never raised this as an issue during its case-in-chief, her testimony would be improper as rebuttal testimony. (R. 68:4-5). With regard to her testimony about her childhood, the defense objected on the basis that it was not victim impact testimony at all, had no relevance to the trial, and would be unduly prejudicial. (R. 68:19, 23-4).

13

The trial court overruled that objection, stating that the testimony was admissible as rebuttal testimony. (R. 68:25).(R. 68:23). In response, the State argued that Mrs. Logie could give victim impact testimony in rebuttal and that, while her testimony about her childhood was not victim impact testimony, it was relevant rebuttal testimony because the defense had presented petitioner's difficult and abusive childhood as mitigating evidence. (R. 68:6, 23-4). The trial court ruled that Mrs. Logie's victim impact testimony was admissible during rebuttal and that her testimony about her childhood was admissible as normal rebuttal testimony. (R. 68:24-5).

Diane Logie then testified, among other things, about physical abuse she had suffered as a child. Specifically, she testified that she was verbally and physically abused by her step-father from the time she was six years old until she was thirteen when her mother divorced him. (R. 68:29-30). Earlier in the trial, several witnesses for the defense testified that petitioner was verbally and physically abused by an alcoholic mother. (R. 65:150-62, 163-71; R. 66:14-21).

In addressing this issue on direct appeal, the Court of Criminal Appeals, assuming without deciding that the testimony was improper rebuttal testimony and that it was error to admit the testimony, held that this error was harmless. In particular, that court noted that the murders committed in this case were brutal, whereas the testimony at issue was brief and unembellished. In ruling any error harmless, the court further stated that the point the State attempted to make with this rebuttal testimony was not prejudicial, as it is commonly known that many people who experience abusive childhoods do not turn to a life of crime. *Varga*, slip op. at 22-24.

The Court of Criminal Appeals' determination that any error was harmless is not contrary to established federal law. As support for his claim, petitioner cites *Darden v. Wainwright*, 477 U.S. 168 (1986) and *Payne v. Tennessee*, 501 U.S. 808 (1991). In *Darden*, the Supreme Court held that,

even where improper evidence or argument is offered by the State at a criminal trial, a habeas petitioner's due process rights under the Fourteenth Amendment are violated only when the trial was so infected with unfairness as to deny the defendant a fair trial. *Id*. at 179-83. Then, in *Payne*, the United States Supreme Court held that the Eighth Amendment did not prohibit the admission of victim impact evidence at the sentencing stage of a capital murder trial, and thus overruled its previous case law on this subject. *Id.* at 827. Instead, the Court held that a state may "legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed." *Id.* at 825. The Supreme Court, however, also stated in *Payne* that the Due Process Clause of the Fourteenth Amendment still prohibits the introduction of evidence that is "so unduly prejudicial that it renders the trial fundamentally unfair." *Id*., at 825.

In the instant case, the testimony given by Diane Logie regarding her abusive childhood was not victim impact evidence as defined by the Supreme Court in *Payne*, as it is not evidence about how the murder of her husband affected her. Instead, it was offered as evidence to rebut the evidence presented by the defense about petitioner's childhood. And, even if this Court assumes, as the Court of Criminal Appeals did, that the admission of testimony from the victim's wife as rebuttal testimony on this issue was improper, petitioner has not shown that the introduction of this evidence was so unduly prejudicial that it rendered his trial fundamentally unfair. In that regard, the challenged testimony was short, consisting of only two pages of the reporter's record and, as noted by the Court of Criminal Appeals, the subject of her testimony was not inflammatory, as her testimony was offered by the State to show that not all people who were abused as children commit violent crimes later in life. While this evidence may not have been relevant evidence to a jury charged with determining whether petitioner

15

would be a future danger and whether mitigating evidence existed that warranted a life, rather, than a death sentence, the challenged testimony did not render petitioner's trial unfair.

Moreover, any error in admitting this testimony into evidence was harmless. At the federal habeas level, the appropriate harmless error test is the one set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993). Under this test, error is deemed harmless if it did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 637. At the punishment phase of the trial, the State presented evidence that, while awaiting trial, petitioner attempted to escape from the county jail with two other prisoners, but was stopped by a guard before the outside door. (R. 63:13-8). There was also testimony that the police in Sioux Falls, South Dakota, had responded to domestic disturbance calls involving petitioner and his ex-wife and that, during these incidents, his ex-wife had reported to the police that petitioner had kicked her, that petitioner had thrown her to the ground, and that he had struck her in the face and knocked her to the ground. (R. 63:77-9, 91-4, 109-110). There was additional testimony presented that petitioner was arrested in South Dakota after he admitted pushing his ex-wife to the ground and that, after he was arrested, a six-inch knife was found in his boot. (R. 63:102-03). At one point, the Sioux Falls police took photographs at petitioner's apartment of: 1) a protection order with "fuck you" written on it; 2) petitioner's ex-wife's driver's license with her the photograph of her face scratched out; and 3) the phrase "death is coming" written in the sink in what appeared to be mustard. (R. 63:125-130). Finally, the State presented testimony that, during his incarceration in a prison in South Dakota for several years for embezzlement, petitioner was classified as being one of the most aggressive and predatory inmates because he would prey on weaker inmates, because the staff had numerous confrontations with him, and because he was considered a constant threat to security. (R. 64:11-25).

Given all of this additional evidence presented by the State at the punishment phase of the trial, combined with the evidence of petitioner's active participation in two beating deaths presented at the guilt phase of the trial, it cannot be said that Diane Logie's brief testimony about her childhood had a substantial and injurious effect or influence in determining the jury's verdict at the punishment phase of petitioner's trial. Accordingly, any error in admitting the evidence was harmless. Petitioner's fifth ground for relief is without merit, and it is denied.

D. **Mitigation Special Issue Claim**

In his fourth ground for relief, petitioner asserts that his Sixth Amendment right to an impartial jury was violated because, at the punishment phase of the trial, the wording of the mitigation special issue did not require the prosecution to prove beyond a reasonable doubt that there was an absence of mitigating evidence justifying a life sentence before petitioner was eligible for the death penalty. Respondent argues that this claim is both procedurally barred and without merit.

Respondent first asserts that petitioner's fourth ground for relief is procedurally barred on federal habeas review because it was denied at the state level on an independent and adequate state law ground. In particular, respondent argues that this claim is procedurally barred because the state habeas court ruled that the claim was barred because petitioner had failed to lodge on objection on this basis at trial.

At the state habeas level, the habeas court concluded that this claim was procedurally barred because petitioner did not make an objection or complaint at trial on this basis. (SHTr. II:177). Alternatively, the state habeas court also denied this claim on its merits. (SHTr. II:177-78).

The Supreme Court has held that, when a state prisoner has defaulted his federal claim when he raised it in state court pursuant to an independent and adequate state procedural rule, federal habeas

17

review is barred unless the prisoner can establish either cause for the default as well as actual prejudice as a result of the alleged violation of federal law *or* that failure to consider the claims would result in a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). To satisfy the independent and adequate requirements, the dismissal of a claim must "clearly and expressly" indicate that it rests on state grounds which bar relief, *and* the bar must be strictly and regularly followed by state courts and applied to the majority of similar claims. *Finley v. Johnson*, 243 F.3d 215, 218 (5th Cir. 2001), *citing Amos v. Scott*, 61 F.3d 333, 338-39 (5th Cir. 1995). The Fifth Circuit has held that the Texas contemporaneous objection rule constitutes an adequate and independent state ground that procedurally bars federal habeas review of a claim. *Jackson v. Johnson*, 194 F.3d 641, 652 (5th Cir. 1999). The Court of Criminal Appeals has also ruled that an objection at trial is need to preserve even constitutional errors for appellate review. *See Allridge v. State*, 850 S.W.2d 471 (1991). Petitioner's fourth ground for relief was therefore denied at the state level on the basis of an independent and adequate state ground, and it is therefore procedurally barred.

Moreover, even considering this issue on its merits, it fails. At trial, the jury was required to answer the following mitigation special issue:

> Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

(Transcript, volume IV:740). Petitioner asserts that his Sixth Amendment right to an impartial jury requires that the jury decide this special issue using the "beyond a reasonable doubt" standard. In particular, petitioner cites the recent Supreme Court cases *Ring v. Arizona*, 536 U.S. 548 (2002), and *Apprendi v. New Jersey*, 530 U.S. 466 (2000), for support for his assertion that federal law requires

that a Texas capital jury be required to find the absence of factors that mitigate against the death penalty beyond a reasonable doubt before a defendant may be sentenced to death.

In addressing this issue at the state level, the state habeas court, citing numerous cases from the Court of Criminal Appeals, concluded that the Constitution does not require that the jury find beyond a reasonable doubt the absence of mitigating factors warranting a life sentence before a defendant may be sentenced to death. (SHTr. II:178). This conclusion is not contrary to clearly established federal law. Petitioner argues that the mitigating special issue acts as an aggravating factor because the absence of mitigating factors aggravates his sentence from life to death, and therefore a jury must find the absence of such evidence beyond a reasonable doubt. But, contrary to petitioner's argument, the Fifth Circuit has specifically held that there is no constitutional requirement that Texas's mitigation issue be assigned a burden of proof. *Rowell v. Dretke*, 398 F.3d 370, 378 (5th Cir. 2003). And, recently, in addressing an identical argument based on the holdings in *Ring* and *Apprendi*, the Fifth Circuit specifically held that a petitioner's Sixth Amendment rights are not violated when state law does not require the prosecution to prove the absence of mitigating factors beyond a reasonable doubt. *See Grandos v. Quarterman*, 455 F.3d 529, 536-37 (5th Cir. 2006), *cert. filed*, No. 06-6932 (Sept. 28, 2006). Petitioner acknowledges this case law, but argues that it was wrongly decided. (Reply at 8). This Court, however, is not at liberty to overrule Fifth Circuit precedent. Petitioner's fourth ground for relief is without merit, and it is denied.

IT IS THEREFORE ORDERED that Petitioner's Petition for Writ of Habeas Corpus be, and is hereby, DENIED.

The Clerk of Court shall transmit a true copy of this Order to Petitioner and to Counsel for Respondent.

SO ORDERED this 28th day of February, 2008.

_____
ED KINKEADE
UNITED STATES DISTRICT JUDGE